**Peter DROSSOS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 4–981A132.

Court of Appeals of Indiana, Fourth District.

Nov. 16, 1982.

Rehearing Denied Jan. 14, 1983.

James H. Voyles, Ober, Symmes, Cardwell, Voyles & Zahn, J.J. Paul, III, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Aimee L. Kolze, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

The defendant-appellant Peter Drossos, while driving his automobile in the Indianapolis area, was involved in an accident in which the driver and three passengers of the other vehicle were killed. Drossos was charged with the death of the other driver and two of his passengers in a six count criminal information. With regard to each victim, Drossos was charged with one count of reckless homicide (Ind.Code 35–42–1–5) and one count of operating a vehicle while intoxicated resulting in the death of another person (Ind.Code 9–4–1–54), both Class C felonies. He was convicted on all six counts and sentenced to three years on each to be served concurrently. We affirm the three convictions for operating a vehicle while intoxicated resulting in the death of another person and remand with instructions to vacate the three reckless homicide sentences.

## ISSUES

Drossos raises three issues on appeal:

1) Did the trial court erroneously exclude testimony of Dr. Robert B. Forney concerning the levels of methamphetamine and ethanol present in the victim-driver's body?

2) Did the trial court erroneously permit the State, in its final argument, to read excerpts from the dissenting opinion of Justice White in *U.S. v. Wade*, (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149?

3) Was there sufficient evidence to sustain verdicts of Reckless Homicide?

## FACTS

On October 12, 1980, Defendant Peter Drossos was involved in an accident in which four people in the other vehicle were killed. Drossos, driving a two-tone 1977 Chevrolet Blazer, was proceeding east on Michigan Street in Indianapolis when he collided at an intersection with a car driven by Myron Way, a stranger to Indianapolis and unfamiliar with its road system, who was traveling north on White River Parkway. The right front of the Blazer struck Way's vehicle just to the rear of its left front fender. Way and two of his passengers died instantly, a third passenger died shortly thereafter.

Michigan Street and the White River Parkway intersect; immediately east of that intersection Michigan Street becomes one way, heading west. Thus, had Drossos driven straight through the intersection without incident he would have been driving the wrong way on a one way street. An automatic traffic signal controls the flow of traffic at the intersection. Shortly before the accident in question, prosecution witness Dennis Wilson and two companions, Jerome Ector and Anthony Hudson, were driving on White River Parkway when they noticed Drossos' Blazer closely following them. It tailgaited them for over a mile, at times leaving only a foot of space between the two vehicles. When they arrived at their destination, Wilson and Ector got out of the car, and the Blazer drove past them. However, when Hudson got into the driver's seat and began to pull away, the Blazer appeared and again began inching up behind Hudson's car. Hudson stopped the car, got out, and pulled a jack handle from the trunk for protection. At this point, the occupants of the Blazer shouted, "see you later brother" and pulled away, heading for the Michigan Street—White River Parkway intersection.

Wilson watched the Blazer leave, describing its speed as "moving pretty fast, ... better than 45." Anthony Hudson stated the driver of the Blazer "floored it," going "maybe 40, 45, or 50." Jerome Ector testified the engine was "roaring" but did not

estimate the miles per hour. Wilson and Hudson continued to watch the Blazer as it headed toward the intersection and both testified the traffic signal was red as Drossos approached the intersection. Neither one, however, saw the Blazer actually enter the intersection nor observed the color of the signal at the moment of impact.

Clarence Hoskins, an Indianapolis Police Officer and accident reconstruction expert, determined through examining the amount of damage and location of the vehicles after the collision that the Drossos Blazer had been exceeding the 30 m.p.h. posted speed limit, whereas the Oldsmobile driven by Myron Way had been traveling at or near that limit. He concluded Drossos was driving too fast to turn in either direction at the intersection (without turning the vehicle over) and was heading the wrong way straight into a one-way street. Hoskins also testified Drossos approached him immediately after the accident, saying "The light was red, I could not stop." Drossos and his passengers, conversely, testified the signal was green as they entered the intersection. Drossos claimed he said "Their light was red, I could not stop," and that due to a speech impediment he had from birth, Officer Hoskins misunderstood him.

On examining the Blazer, the police found several beer and liquor bottles on the floor. Several police officers testified Drossos and his companions were visibly intoxicated immediately following the collision. A breathalizer test administered to Drossos by Officer Hoskins registered .17%, well over the statutory prima facie limit.[1]

1. *Evidence of the Victim-Driver's Intoxication and Drug Use*

At trial, the defense called Dr. Forney, Director of the Indiana State Department of Toxicology, to testify concerning the levels of methamphetamine and ethanol (alcohol) in Way's, the deceased driver's, bloodstream and urine. The judge sustained the prosecutor's objection to such testimony. Outside the jury's presence, Drossos made an offer to prove establishing through Dr. Forney's testimony that Way had a level of .014 milligrams per deciliter of methamphetamine and a level of 39 milligrams per deciliter of ethanol in his blood (an amount of concentration which would register .039% on the breathalizer) at the time of the accident. Dr. Forney's pertinent testimony with respect to the amphetamine and alcohol and their effects on a human being was as follows:

"Q. It's a Methamphetamine, and we call that speed, don't we?

A. Well, that's the name for it in the street. It's a ligitimate [sic] theraputic [sic] agent. Desoxyn is the one most common preparation of this that is used to help people stay awake.

Q. Like a "No-Doze" [sic]?

A. Yes. It's a prescription...

Q. It could even be an over-the-counter thing, couldn't it?

A. No, it could not have come from over-the-counter, legally. It's a controlled substance.

(Tr. p. 1155)

. . . . . .

Q. And, the drug, itself, you previously testified I believe, that it is a controlled substance. Is that correct?

A. Yes.

Q. But, it can be obtained through the prescription of a doctor. Is that correct?

---

1. Ind.Code 9–4–1–54(b)(4) states: "At the trial of a person charged with violating subdivision (1)(A) of this subsection evidence of the amount of alcohol that was in his blood at the time of the alleged violation, as shown by a chemical analysis of his breath, blood, urine, or other bodily substance is admissible as follows:

(A) Evidence that there was ten hundredths percent (.10%), or more, by weight of alcohol in his blood constitutes prima facie evidence that he was intoxicated.

(B) Evidence that there was more than five hundredths percent (.05%), but less than ten hundredths percent (.10%), by weight of alcohol in his blood constitutes relevant evidence as to whether he was intoxicated. (C) Evidence that there was five hundredths percent (.05%), or less, by weight of alcohol in his blood constitutes prima facie evidence that he was not intoxicated."

A. Yes.

Q. And, ofter [sic], it's used in fact, isn't it, for weight reduction?

A. Yes. It's possible.

Q. That's one of the very possible uses of that type of drug?

A. Yes, it is.

(Tr. p. 1159)

Q. The Desoxyn, the drug that was involved that was found in the body of Myron Way. Would you explain to the Court the level of the Desoxyn or the Methamphetamine, more accurately I guess, that was found in Myron Way's body, in the Toxicology Report?

A. Point 0, one four (.014) Milligrams per Deciliter [sic].

Q. Okay. Would you describe the significance of that level of that particular drug, or chemical in Myron Way's body, as it would relate to how he would be able to drive a motor vehicle?

A. I think that it would have little or no effect. On his performance.

Q. Okay. It would have little or no effect?

A. On his performance, yes.

Q. It would be insignificant as to how he was operating his motor vehicle?

A. I think so, yes.

Tr. p. 1158–59.

Q. The amount of Ethanol in the individual's body, itself, would that have had . . what type of effect would that level [.039%] have on an individual who was driving a motor vehicle?

A. I don't think that it would have had measureable effect.

Q. Okay, what do you mean by 'measureable effects," Doctor Forney? If you would describe for the Court and for the record.

A. I don't believe that in our laboratory we would be able to detect [any] performance [detriments] as a result of that amount of alcohol. We've had much experience in trying to do that. And, generally, blood-alcohol concentrations have to be in the neighborhood of five hundred percent (500%), point 0, five (.05) before we can begin to measure impairment." Tr. pp. 1160–61.

Drossos contends on appeal the court erred in excluding evidence of Way's use of an amphetamine and intake of alcohol, claiming this evidence was relevant to show Way's conduct, not his, was the entire cause of the accident. He argues that only one driver could have run the red light, and whichever driver did so proximately caused the fatal crash. He contends his proffered evidence was relevant to show Way's senses were impaired by alcohol and drugs.

■ In response to Drossos' arguments we first note the well established rule in this jurisdiction that before we are permitted to find a trial court abused its discretion in rejecting proffered evidence supported by an offer to prove, we must first conclude such offer established the materiality, competency, and relevancy of the evidence offered. *Pavone v. State,* (1980) Ind., 402 N.E.2d 976; *Tope v. State,* (1977) 266 Ind. 239, 362 N.E.2d 137, U.S. *cert. denied* 434 U.S. 869, 98 S.Ct. 209, 54 L.Ed.2d 146; 28 I.L.E. *Trial* § 45 (1960).

■ Drossos, of course, contends the existence of methamphetamine and alcohol in the blood of Way *tended* to prove that Way was under the influence of the drug and the alcohol, and their existence impaired his driving ability. But Dr. Forney, the only expert testifying about the effects of the amphetamine and alcohol and Drossos' own witness, claimed the methamphetamine had an "insignificant" impact on Way's driving ability and the alcohol had "no measurable effect."[2] We can not say the effect on the driving ability of an individual of these traces of methamphetamine and alcohol is a matter within the common knowledge of a layman; consequently, we rely on basic Indiana law that "expert testimony is required where the question involves medical

---

2. Our statute Ind.Code 9–4–1–54 quoted earlier in footnote 1 provides that the existence of less than .05% by way of alcohol in the blood constitutes prima facie evidence that the driver was *not* intoxicated.

factors beyond the common knowledge of the layman such that the jury could only indulge in speculation making a finding based thereon." *Johnson v. Bender,* (1977) 174 Ind.App. 638, 644, 369 N.E.2d 936, 940. Thus we conclude that expert testimony was required to show what effect, if any, the alcohol and drug had on Way's driving ability. The cited Indiana case law prohibits the placing before the jury of evidence that traces of alcohol and drugs were within Way's body leaving to the jury's speculation the effect of those drugs.

■ Under the facts of this record we can not find the trial court abused its discretion in excluding the testimony in question.[3]

*Reading of Case Law To the Jury*

■ During the prosecutor's final argument he obtained permission, over objection of Drossos, to read the following language of Justice White in his dissenting opinion in *U.S. v. Wade, supra:*

"Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making

the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth. Undoubtedly there are some limits which defense counsel must

---

**3.** It appears the trial court may have erroneously relied upon the case of *State v. Plaspohl,* (1959) 239 Ind. 324, 157 N.E.2d 579, in excluding the evidence. In that case, in which the defendant was charged with reckless homicide, the evidence established that a fatal accident occurred while the defendant was engaged in a drag race. The decedent, an occupant of the defendant's car, actively participated in planning and starting the race and the death occurred when the defendant's car, which was traveling in excess of 85 m.p.h., went out of control after it attempted to pass the car which it had been racing. Our Supreme Court concluded that contributory negligence is not available as a defense or an excuse in a criminal prosecution.

"'[T]his doctrine has no place in criminal law, and it can not in any degree purge an act which otherwise constitutes a public offense of its criminal character. Accordingly the contributory negligence of a person injured or killed by the criminal negligence of another does not relieve the latter from criminal responsibility....' [*quoting* 22 C.J.S. Criminal Law § 52, pp. 116–117]

Reckless homicide is a crime committed against the state. Therefore, contrary to the rule in civil cases, the fact that the deceased victim was 'an active participant in the unlawful act which resulted in his death,' as stated in instruction 11, does not bar an action against another for the wrong which he has committed *against the peace and dignity* of the state."

*Id.* at 326–27, 157 N.E.2d at 580–81.

Here, as Drossos correctly asserts, evidence that Way was under the influence of drugs and/or alcohol *so as to impair his driving ability* was admissible to show Way was *solely* responsible for the accident, that is, that Drossos entered the intersection lawfully, under a green light as he and his companions testified, and Way ran the red light.

An erroneous reason given by the trial court does not preclude our sustaining his action. In reviewing a judgment on appeal it is the duty of the appellate tribunal "to sustain the action of the trial court if it can be done on any legal ground on the record. This is true even though the reason given by the trial court might be erroneous, if the ruling can be sustained on another ground." *Cain v. State,* (1973) 261 Ind. 41, 45–46, 300 N.E.2d 89, 92.

observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth."

*Id.* at 256–58, 87 S.Ct. at 1947–48. Drossos claims the reading of the foregoing language was unfair and prejudicial as it painted the character of his defense counsel in a bad light. In addressing this issue we first observe it is permissible to read the law to a jury and the propriety of doing so in an individual case rests within the sound discretion of the trial court. *Lax v. State,* (1981) Ind., 414 N.E.2d 555.

■ In the case of *Hubbard v. State,* (1974) 262 Ind. 176, 313 N.E.2d 346 this same issue was presented to our Supreme Court. Therein, after noting it is permissible in a criminal case for opinions to be read and discussed before the jury in final argument as to the law and the facts, Justice Arterburn, speaking for the court, stated:

"The passages read by the prosecutor emphasized the point of view that at trial the role of a defense attorney is to serve his client rather than to join with law enforcement officers in an abstract search for truth. Appellants suggest that the reading of such a passage to the jury prejudiced them. We think that by the end of a long trial a jury can hardly be unaware of the role of defense counsel in our adversarial system. In any event, this act of the prosecutor was not such as to place the defendants 'in grave peril' and thereby warrant a new trial. *White*

*v. State,* (1971) 257 Ind. 64, 272 N.E.2d 312."

*Id.* at 182–83, 313 N.E.2d at 350.

Based on *Hubbard,* we find the contention of Drossos to be without merit.

*Sufficiency of the Evidence Supporting Reckless Homicide Convictions*

■ Finally, we address Drossos' contention, allegedly supported by language in *DeVaney v. State,* (1972) 259 Ind. 483, 288 N.E.2d 732 and *Williams v. State,* (1981) Ind., 423 N.E.2d 598 that, while the evidence was sufficient to support the charges of causing death by operating a motor vehicle while intoxicated, it did not indicate the requisite reckless conduct sufficient to support his reckless homicide convictions. Although we tend to disagree,[4] we need not reach this issue. Drossos was convicted twice for killing each victim. This was impermissible as recently pointed out by Judge Garrard in *Carter v. State,* (1981) Ind.App., 424 N.E.2d 1047 (Staton, J., concurring) where the same two statutes were involved. In a case such as this, there was but one homicide of each victim and evidence can support but one conviction. Judge Garrard stated:

It matters no more that Carter was both intoxicated and driving recklessly and causing his passengers death than it would have had Carter poisoned him, stabbed him and thrown him from a high bridge. *The means of committing an offense may not be utilized to multiply the number of offenses committed. Only one homicide was committed and only one sentence may be imposed. Bond v. State,* (1980), Ind., 403 N.E.2d 812; *Bean v. State,* (1978) 267 Ind. 528, 371 N.E.2d 713."* (Emphasis added.)

*Id.* at 1048.

By reason of the above, Drossos' convictions for causing death by operating a mo-

4. *DeVaney* stands for the general proposition that mere intoxication, although it can be considered by a jury in determining whether there was "reckless disregard" involved in a reckless homicide, was insufficient, along with evidence of a traffic violation (the defendant had also crossed the center line of the roadway) to convict for reckless homicide. The evidence in this case would appear to distinguish the situation

from that considered in *DeVaney.* Here, the jury could have inferred, in addition to Drossos' intoxication, that 1) he ran a red light; 2) he was traveling at an excessive speed; and 3) because of such speed he would have been unable to avoid improperly entering a one way street. Such evidence, plus his intoxication, exhibited a reckless disregard for the property and person of others.

tor vehicle while intoxicated are affirmed. However, pursuant to Ind. Rules of Procedure, Appellate Rule 15(N), we remand to the trial court with instructions to vacate the three convictions for reckless homicide.

BUCHANAN, C.J. (sitting by designation), concurs.

CONOVER, J., dissents with separate opinion.

CONOVER, Judge, dissenting.

I respectfully dissent. The position the majority adopts today denies to Drossos the opportunity to make his defense to this case. It was reversible error for the trial court to refuse to allow him to present evidence of the presence of drugs and alcohol in Wey's body at the time of death. Such evidence would have supported his contention the deceased driver's negligence, rather than his own, proximately caused the collision.

It is incumbent upon the State in a homicide case to prove the defendant's unlawful conduct is the direct and proximate cause of the death of the victim. *Carter v. State,* (1968) 250 Ind. 50, 234 N.E.2d 850; *Reed v. State,* (1979) Ind.App., 387 N.E.2d 82; *State v. Kelsey,* (1975) 163 Ind.App. 543, 325 N.E.2d 218. Thus, it is a complete defense to such action that the deceased driver's own negligence was the proximate cause of the collision, as Drossos maintains it was in this case.

Evidence relating to chemical analysis of body tissues, fluids and breath in this type of case is common. The State used the results of a breathalyzer test on Drossos to establish he tested .17 percent blood alcohol and eyewitness testimony the traffic signal was red as Drossos approached the intersection to prove he ran the light. Drossos on the other hand introduced eyewitness testimony that the light was green when he entered the intersection. To further buttress his claim the deceased driver ran the red light, Drossos's counsel attempted to introduce evidence through Dr. Forney, Director of the Indiana State Department of Toxicology, that Wey had alcohol and drugs in his bloodstream. Samples of decedent Wey's blood and urine were submitted to that Department for analysis as part of this investigation. Thus, the only source from which Drossos could get this evidence was Dr. Forney. The State had listed Dr. Forney as a witness along with other physicians in Indianapolis. Drossos's counsel had adopted the State's list of witnesses as its own along with others when the pre-trial list of witnesses was filed.

The question of who ran the red light was the key element in this case because the person who ran it caused the death of Wey and his passengers. That person could have been only Drossos or Wey. Evidence of alcohol and "speed" in Wey's bloodstream was indeed relevant, competent, and material. Wey's unfamiliarity with Indianapolis and its road system coupled with such evidence and expert testimony as to the resulting impairment of Wey's comprehension and reaction time while driving a car under such conditions, if any, could have been the turning point in this trial for the defense. Under our system, after all, a defendant need only establish a reasonable doubt in the minds of the jury to be acquitted. That concept is one of the bellwethers of our judicial system, a major contributor to the freedom which we today enjoy. In my opinion we should not even slightly impair the absolute and unqualified right of a defendant in a criminal case to make a full and complete defense.

Dr. Forney's testimony as to the chemicals and alcohol in Wey's bloodstream was relevant, competent, and material. Its exclusion was not harmless. Where material evidence is excluded, the error is presumed to be harmful unless the contrary is made to appear from the record. *Keller v. Cox,* (1918) 67 Ind.App. 381, 118 N.E. 543; *J.P. Smith Shoe Co. v. Curme-Feltman Shoe Co.,* (1918) 71 Ind.App. 401, 118 N.E. 360; *Benjamin v. McElwaine-Richards Co.,* (1894) 10 Ind.App. 76, 37 N.E. 362. No such showing was made.

Further, such exclusion is a violation of the due process clause of the Fourteenth Amendment. *Green v. Georgia,* (1979) 442

U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738; *Chambers v. Mississippi,* (1973) 410 U.S. 284; *Pelle v. Diners Club,* (1974) Fla.App., 287 So.2d 737.

The majority points out Dr. Forney was the only expert testifying about the effects of the amphetamine and the alcohol on Wey and was Drossos's own witness, testifying the amphetamine had an "insignificant" impact on Wey's driving ability and the alcohol had "no measurable effect." He was the only expert testifying because Drossos was given no opportunity to call other experts to dispute Forney's opinions. He was the only expert testifying because he was the only witness who could establish the presence of the alcohol and "speed" in Wey's bloodstream because his laboratory did the analysis. Had the fact of the presence of such chemicals been established by Forney's testimony, Drossos could have called other experts to dispute Dr. Forney's opinions. That opportunity was denied him by the trial court's action. We weigh the evidence when we say the effect of the alcohol and drugs on Wey was *de minimis.* We may not do so on appeal.

The question of the proximate cause of the collision and resulting deaths is properly one for the trier of fact, the jury in this case. *Kraft v. State,* (1930) 202 Ind. 44, 171 N.E. 1; *Coffelt v. State,* (1974) 159 Ind.App. 485, 307 N.E.2d 497. The evidence of alcohol and drugs in the deceased driver's bloodstream was competent, relevant and material on that question. Its exclusion was reversible error.

I would reverse and remand for a new trial.